# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 14, 2009 Session

## GEORGE R. CROFT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-27318     John P. Colton, Jr., Judge**

---

**No. W2008-00449-CCA-R3-PC  -  Filed November 5, 2009**

---

The petitioner, George R. Croft, appeals the denial of his petition for post-conviction relief. The petitioner was found guilty of especially aggravated robbery and felony murder in the perpetration of a robbery. He was sentenced as a Range I, violent offender to life imprisonment for the felony murder conviction and to twenty-two years for the especially aggravated robbery conviction. On appeal, he contends that his counsel were ineffective and that he should be granted a new trial because trial counsel did not conduct voir dire pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), with regard to his desire to testify at trial. After careful review, we affirm the judgment from the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, George R. Croft.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Dennis Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The facts underlying this case were summarized by this court on direct appeal as follows:

Brenda McKinney testified that she was driving to a Mapco convenience store on the corner of Alcy Road and Blakemore Street at approximately 2:00 a.m. on July 15, 1996. She observed a car "coming diagonally across the street." McKinney testified that she then saw the Defendant "trying to jump out or . . . hanging out [of] the car." She recalled that the car then hit a pole, that the Defendant "went up in the air and fell on the ground," and that the car kept going. McKinney stated that she got out of her car, walked over to the Defendant, and asked him if he needed help. She reported

that the Defendant was bleeding and pleading for help. McKinney testified that a man then ran from the direction of the car to the Defendant, pulled on his arm, and told him to get up. The Defendant told the man that he could not get up and that he needed help. McKinney testified that the man "just panicked and started saying, Help, help, somebody help me. And then he ran." McKinney then called for an ambulance and police, and the dispatcher told her to go to the car and see if anyone was inside. McKinney testified that she walked to the car and observed Johnas Venzant, the victim in this case, lying inside the car. She recalled that the passenger door was open. She testified that she touched the victim's arm and determined that he had a pulse. McKinney waited at the scene until police arrived and relayed to them what had happened. She did not observe either the Defendant or the man who ran to the Defendant after the accident in possession of a gun, although she saw a gun when the police recovered it.

Officer W. Mathena testified that at 2:06 a.m. on July 15, 1996, he received a call regarding an accident at the intersection of Alcy and Blakemore. When he arrived at the scene, he saw the Defendant lying in the street. Mathena recalled that he asked the Defendant if he wanted an ambulance, and the Defendant responded that he did. He later found out that an ambulance was already en route to the crime scene. Mathena then observed a blue Pontiac Bonneville with the passenger door open. He testified that there was a victim inside the car who looked as if he "had been shot a few times" and who was "covered with blood." He also observed a hubcap and a baseball cap in the street. Mathena testified that after speaking to a female witness, he put out a broadcast that a black male was observed running from the scene towards the Clementine Apartments. Mathena testified that Officer Rogers located a black pistol laying in a grassy area near the Pontiac.

. . . .

Sergeant James L. Fitzpatrick organized the homicide investigation and reviewed findings made by the individuals who investigated the scene of the crime. He testified that he went . . . to the hospital and obtained a statement from the Defendant and that he also assisted in obtaining a statement from Joseph Russell, who was also charged with the victim's murder. Fitzpatrick reported that the victim was identified through fingerprinting and prior court records. . . . Fitzpatrick testified that the Defendant's mother identified him at the hospital.

. . . .

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner, performed an autopsy on the victim on July 15, 1996. According to Smith, the victim had sustained multiple gunshot wounds to the head and neck region, to the top of the right shoulder, and to the left arm. He stated that he identified six bullet paths within the

victim's body which could have been made by as few as five different bullets. Smith testified that he recovered three bullets from the body and turned them over to the Memphis Police Department. He explained that three of the bullets injured the victim's spine, causing incapacitating wounds. Smith stated that the weapon that was used on the victim was close enough at the time of discharge to leave powder burns on the victim's face. Smith opined that if the victim "was the driver of an automobile and in a normal driving position at the time that the shots were fired, then the shots would come from back to front and from the right to the left primarily." Although he stated that he could not eliminate anyone in the vehicle as the shooter, based on his autopsy and photographs of the car, he was "able . . . to establish that the likelihood of the weapon being discharged came more from the rear than from the side." Finally, he testified that the victim tested positive for cocaine and marijuana, and two packets of cocaine were found on the victim's person.

Joseph Russell, who at the time of the Defendant's trial had also been charged with the murder of the victim, testified that in 1996 he had been a drug dealer for eight or nine years. Russell testified that the victim was his drug supplier and that the Defendant was another local drug dealer. Russell stated that at approximately 10:00 p.m. on July 14, 1996, the Defendant, whom Russell had never met before, approached Russell and asked to purchase a quarter-ounce of crack cocaine. Russell informed the Defendant that he did not have the quantity of "dope" that the Defendant requested and would have to contact his supplier.

Russell and the Defendant then got a ride with a man named Sterling Howard to the apartment of Russell's friend, Shemmika Fullwiley, and her roommate, Stacey Young. According to Russell, he and the Defendant remained at Fullwiley's for a brief period of time drinking beer and smoking marijuana. Russell testified that while there, the Defendant pulled out a pistol and laid it on a table. Russell reported that he picked up the pistol and told the Defendant to put it away. Russell then paged the victim. According to Russell, the victim called Russell a few minutes later, and Russell, the victim and the Defendant agreed to meet at the Mapco station because the victim said that the Clementine apartment complex where Fullwiley and Young lived was "hot" with police.

Russell testified that he and the Defendant then walked to the convenience store. As they were walking, the Defendant asked Russell how much money he owed the victim, and the Defendant told Russell that he should not pay the victim what he owed the victim. They arrived at the Mapco as the victim was walking from the store to his car. Russell recalled that all three of the men got into the vehicle at the same time. Russell got into the front passenger seat, and the Defendant got into the rear seat just behind Russell. Russell testified that after the victim got into the car, the victim started the car, passed a quarter-ounce of crack cocaine to Russell, and then asked the Defendant for money. The Defendant asked how much the victim wanted,

and the victim replied by asking how much the Defendant had. According to Russell, the Defendant stated that he wanted Russell and the victim to give him "everything that's in the car," but started shooting before Russell and the victim had a chance to respond.

Russell testified that when the shooting started, the victim "jacked back in the car," and the car began to "speed up a lot." The car surged across the street and crashed into a fence. At this point, Russell jumped out of the car. Russell stated that he started running down the street and saw the Defendant lying in the street by a curb. Russell recalled that he heard the Defendant moan and then saw the Defendant stop moving. Russell testified that he did not stop to help the Defendant. However, he saw a woman driving down the street, and the woman asked him if she could help. Russell stated that he told her to call the police. Russell reported that he then ran back to Fullwiley's, where he ran inside and "throwed up in their bathroom." Russell testified that he did not remain at the scene because he was "scared." Russell stated that while at Fullwiley's apartment, Fullwiley noticed blood on Russell's shirt. Russell reported that two days after the incident, he saw the incident on the news and called the police.

*State v. George R. Croft*, No. W2001-00134-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 1005, at **2-11 (Tenn. Crim. App., at Jackson, Nov. 20, 2002).

Post-Conviction Hearing

The petitioner testified at the post-conviction hearing that he was represented by two attorneys at trial. He did not recall being arrested because he was unconscious from the injuries he suffered during the crime. He told his attorneys that he was not conscious when the crime occurred because he was hit in the head with the barrel of a nine-millimeter gun and that he was a victim in the underlying case.

The petitioner testified that, while waiting for trial to begin, he suffered a stroke which resulted in memory loss. He said that he wanted to testify in his defense, but counsel advised him against it. His father advised him to listen to his attorneys. The petitioner said he did not realize it was his decision to testify. He said that his attorneys informed him of his right to testify during jury voir dire and that they did not discuss with him his desire to testify after the State presented its case. The trial judge did not ask him if he wanted to testify.

He also testified that he and his attorneys did not discuss that he could have witnesses to testify on his behalf. Counsel told him that his proposed witness, "Sugarhead," was not a reliable witness because of his criminal record. The petitioner said that counsel did not discuss with him the possibility of having medical personnel testify at trial. His attorneys gave him the discovery materials and explained it to him.

-4-

On cross-examination, the petitioner acknowledged that he could not remember what happened at the crime scene after he suffered his head injury. He clarified that his attorneys could have called "Sugarhead" as a witness even though he was not present during the commission of the crime. However, he said that "Sugarhead" knew what events occurred leading up to the crime. The petitioner testified that his attorneys told him the prosecutor would "eat [him] up" if he testified because he could not recall when the co-defendant "pulled the trigger." After this conversation, he decided not to testify.

The petitioner's mother testified that her son's attorneys discussed his case with him while in her presence because she was his guardian. She testified that the petitioner had difficulty functioning on his own and had trouble understanding questions posed to him. She said that he suffered meningitis of the brain, which put him in a coma for thirteen days and caused some paralysis. She was present when the attorneys discussed the possibility of the petitioner testifying on his own behalf. The meeting occurred in the courthouse, and one of the attorneys stated the petitioner would not testify because there was no need for it. She did not like the decision and again spoke with the attorneys about the petitioner testifying. The petitioner's mother testified that her husband told the petitioner to go along with the attorney's advice and that the petitioner agreed he would not testify.

On cross-examination, she testified that his attorneys were insistent the petitioner should not testify and that her husband advised her that he thought the attorneys knew what they were doing and that the petitioner should follow their advice. Her son agreed to go along with the advice to not testify.

Both attorneys who represented the petitioner at trial testified during the post-conviction hearing. They testified that they met with the petitioner and his parents several times and that they urged him to share anything that would assist in his defense. They pursued a theory of defense that the petitioner could not have known what happened in the case because of his injuries. They tried to place blame on the co-defendant. They testified that the petitioner's story of the events surrounding the crime was initially consistent but began to shift and that they could not determine what caused the shift in his recollection of events.

Counsel spoke with the doctor who examined the petitioner and decided that it was unnecessary to call him at trial because it was not clear that his testimony would assist the petitioner. Some of the information from the doctor contradicted what they wanted to show at trial. They testified that they spoke with the petitioner, his mother, and his stepfather about him testifying and advised that he not testify due to his memory problem. They were most concerned with problems during cross-examination because they did not want the petitioner to appear to be lying. They testified that the petitioner knew that he had a right to testify and that he indicated he did not want to testify. They recalled that there was a consensus that he would not testify and that the petitioner was in agreement and made the ultimate decision not to testify. One of his attorneys testified that he believed there was no need for the petitioner to testify because he thought they could discredit the co-defendant because of his prior criminal record.

Counsel testified that, because of the petitioner's medical condition, they kept the petitioner's parents involved in his defense and in their meetings. They pursued an issue regarding a missing gun residue test, but the test could never be located. Counsel also testified that the co-defendant testified in street clothes rather than a jail uniform, as asserted by the petitioner.

They recalled that the petitioner wanted "Sugarhead" to testify but, after their investigator met with him, they decided he was not a credible witness. They talked with many people in the apartment complex where the shooting occurred and proceeded on a theory that the co-defendant was the shooter.

Counsel could not recall why there was no voir dire of the petitioner regarding his testimony. If voir dire had occurred, it would have made the petitioner's desire "perfectly clear"; however, counsel did not think the petitioner would have said anything differently on voir dire.

Analysis

First, the petitioner argues that he received ineffective assistance of counsel. Specifically, the petitioner argues on appeal that counsel was ineffective for failing to call medical personnel to testify on his behalf at trial. The petitioner did not call any medical personnel to testify during the post-conviction hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); *see also Scott v. State*, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996). As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness resulted in the denial of critical evidence which caused the petitioner prejudice. *Black*, 794 S.W.2d at 757. Neither the trial court nor this court can speculate on what a witness's testimony might have been if introduced by counsel. *Id.* Because the petitioner failed to call the medical personnel, he has failed to demonstrate that he was prejudiced by counsel's decision not to call the witnesses to testify at trial.

Next, the petitioner argues that trial counsel's failure to conduct a voir dire pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), should result in a grant of a new trial to the petitioner. A criminal defendant has a constitutional right to testify at trial. *See* U.S. Const. Amends. 5, 14; Tenn. Const. Art. I, § 9; *Momon*, 18 S.W.3d at 157. This right is fundamental and may only be personally waived by the defendant. *Momon,* 18 S.W.3d at 161 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019 (1938)). The waiver of a fundamental right will not be presumed from a silent record, *see State v. Muse*, 967 S.W.2d 764, 767 (Tenn. 1998); *House v. State*, 911 S.W.2d 705, 715 n.20 (Tenn. 1995), and the courts should indulge every reasonable presumption against the waiver of a fundamental right. *Id.* (citing *State ex rel. Barnes v. Henderson*, 423 S.W.2d 497, 502, 220 Tenn. 719, 730 (Tenn. 1968)). In every criminal trial where the defendant does not testify,

defense counsel must demonstrate, either by submitting a written waiver or by conducting an in-camera hearing, that the defendant understands that:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Momon*, 18 S.W.3d at 162. However, the mere failure to follow these guidelines will not, in and of itself, support a claim for deprivation of the constitutional right to testify if there is evidence in the record to establish that the right was otherwise personally waived by the defendant. *Id.* at 163.

Here, the post-conviction court found that trial counsel properly advised the petitioner with regard to his right to testify. The post-conviction court found that the petitioner's counsel informed him of his right to testify and advised the petitioner that the State's attorney would "eat him up" if he testified. In the order denying relief, the post-conviction court noted that, during the evidentiary hearing, the petitioner testified he waived his right to testify primarily because of the influence of his father.

During the post-conviction hearing, the petitioner testified that his attorneys informed him of his right to testify during his trial and that he made the decision not to testify. His attorneys testified that the petitioner knew he had a right to testify and that he chose not to testify. Both attorneys met with the petitioner and his family, and there was a general consensus that he would not testify. The attorneys testified that the petitioner was in agreement with the decision and that he made the ultimate decision not to testify. The record supported the conclusion that the petitioner personally waived his right to testify. The petitioner is not entitled to relief on this issue.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE